# Deposition Transcript of Dillon Burnett

STATE OF MICHIGAN

FOR THE WESTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION

DILLON BURNETT,
an individual,

    Plaintiff,

v                                      File No. 1:19-cv-257

                                      HON. JANET T. NEFF and
                                      MAGISTRATE JUDGE SALLY
                                      JACOBA BERENS

JOSH GRIFFITH,

    Defendant.

                                /

DEPOSITION OF DILLON BURNETT

Taken by the Defendant on the 20th day of February, 2020, at

320 North Hubbard, Saint Louis, Michigan at 1:00 p.m.

APPEARANCES:

For the Plaintiff:        MR. WILLIAM F. PIPER (P38636)
                            William F. Piper PLC
                            1611 West Centre Avenue, Suite 209
                            Portage, Michigan 49024
                            (269) 321-5008

For the Defendant:       MR. MICHAEL S. BOGREN (P34835)
                            Plunkett Cooney
                            333 Bridge Street NW, Suite 530
                            Bridgewater Place
                            Grand Rapids, Michigan 49504
                            (269) 226-8822

Also Present:            Mark Ott



**Page 2**

1  RECORDED BY:         Emilee Nielsen, CER 9361
                        Certified Electronic Recorder
2                       Network Reporting Corporation
                        Firm Registration Number 8151
3                       1-800-632-2720
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

```
1                    TABLE OF CONTENTS
2                                                PAGE
3
     Examination by Mr. Bogren . . . . . . . . . . . . . . . 5
4
5
6                    EXHIBIT INDEX
                                                 PAGE
7
8    Deposition Exhibit 1 marked . . . . . . . . . . . . . . 18
     (Complaint)
9
     (Exhibit retained by Mr. Bogren)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

1       Saint Louis, Michigan
2       Thursday, February 20, 2020 - 1:17 p.m.
3            MR. BOGREN: Let the record reflect that this is
4  the date, time and place noticed for the deposition of the
5  Plaintiff, Dillon Burnett, in the matter of Burnett versus
6  Josh Griffith.
7            Mr. Burnett, my name is Michael Bogren. I
8  represent Josh Griffith in the lawsuit that you've filed.
9  I'm going to be asking you some questions here today. A few
10 ground rules; if you don't understand one of my questions,
11 please tell me. I'm not trying to trick you, I'm just
12 trying to get information. So if you don't understand my
13 question, that's not going to be helpful to either one of
14 us, so please tell me and I'll restate it so you do
15 understand it.
16           MR. BURNETT: Okay.
17           MR. BOGREN: If you don't hear a question,
18 obviously tell me and we'll repeat it. If you can answer a
19 question with a "yes" or a "no," please say "yes" or "no"
20 rather than nodding or shaking your head or saying "uh-huh"
21 or "unh-unh" because the court reporter has to take down
22 everything that's said.
23           MR. BURNETT: Okay.
24           MR. BOGREN: And when she transcribes "uh-huh"
25 it's kind of difficult when you go back and read the

**Page 5**

1  transcript to figure out what was being said. So if you do
2  that -- and I've been doing this for 35 years and I have yet
3  to be in a deposition where somebody hasn't done it -- I'm
4  going to ask you to clarify. I'm going to say "Is that
5  'yes' or is that 'no'?" I'm not challenging your answer.
6  I'm just making it clear for the record what your answer is.
7  Okay?
8            MR. BURNETT: Okay.
9            MR. BOGREN: Please wait for me to finish my
10 question before you start to answer it. And by the same
11 token, I'll wait for you to finish your answer before I ask
12 my next question because, again, she can't take down two
13 people talking at the same time. Okay?
14           MR. BURNETT: Okay.
15           MR. BOGREN: I guess the break thing is sort of
16 off the table here, so we'll just get started.
17           MR. BURNETT: Okay.
18           REPORTER: Do you solemnly swear or affirm that
19 the testimony you're about to give will be the whole truth?
20           MR. BURNETT: Yes, I do.
21                    DILLON BURNETT
22 having been called by the Defendant and sworn:
23                    EXAMINATION
24 BY MR. BOGREN:
25 Q  We're at the Central Michigan Correctional Facility in Saint

## Page 6

1   Louis which is where you're incarcerated; correct?
2   A   Yes.
3   Q   And my understanding is you pled guilty to first degree home
4       invasion in Van Buren County Circuit Court which led to your
5       incarceration here; is that correct?
6   A   Yes.
7   Q   It's also my understanding that you were sentenced in Van
8       Buren County on August 12th of 2019 based on a guilty plea;
9       is that correct?
10  A   Yes.
11  Q   And you were sentenced to a prison term of seven years, one
12      month to 20 years; is that correct?
13  A   Yes.
14  Q   And was that Judge Brickley that sentenced you?
15  A   Yes.
16  Q   The date of the offense that gave rise to that sentence was
17      July 28 of 2018?
18  A   Yes.
19  Q   Do you recall when you were arrested for that July 28, 2018
20      offense?
21  A   Yes.
22  Q   When?
23  A   On the 28th of July.
24  Q   And then were you lodged in the Van Buren County Jail when
25      you were arrested?

## Page 7

1   A   Yes.
2   Q   And did you bond out or were you in the jail until your
3       guilty plea?
4   A   I was in the jail the whole time.
5   Q   Okay. Do you recall what agency arrested you?
6   A   I think state police.
7   Q   And where -- physically where was the offense committed?
8   A   At a home.
9   Q   Yeah.
10  A   I don't know the address or anything. It was in Lawton.
11  Q   That's what I was asking.
12  A   Okay.
13  Q   Now, you filed a lawsuit against Josh Griffith because of an
14      event that occurred earlier in 2018 and specifically on
15      January 12th of 2018; is that correct?
16  A   Yes.
17  Q   And again as I understand it, you were arrested on January
18      12th of 2018 for failure to appear for an earlier bond
19      condition; is that accurate?
20  A   For failure to go to a work crew, yes.
21  Q   And being a part of the work crew was a condition of the
22      bond that had been set for an earlier arrest; is that right?
23  A   No, it was --
24  Q   Okay.
25  A   Being on a work crew was part of a guilty plea to a bond

## Page 8

1   violation.
2   Q   All right. Thank you. And you were arrested by a Van Buren
3       County Sheriff's Deputy who was -- as I understand it, he
4       was investigating a report of an abandoned car and you
5       arrived at the scene and when he ran you through LEIN, there
6       was a warrant outstanding; is that right?
7   A   I don't know what he did, but when I came back to my car,
8       yes, he was there and I was clearly the owner of the car.
9   Q   And he arrested you for the outstanding warrant for failure
10      to appear, is that your understanding?
11  A   For my warrant, yes, sir.
12  Q   And then he took you to the -- to the jail in Paw Paw?
13  A   Yes.
14  Q   And you were arraigned by a video arraignment on that same
15      day; correct?
16  A   Yes.
17  Q   And that was in front of Judge McKay?
18  A   Yes, sir.
19  Q   Have you seen the video of the arraignment?
20  A   No.
21  Q   There is a video of the arraignment which I've seen.
22  A   Yes.
23  Q   And based on my review of the video it appears that Judge
24      McKay held the arraignment, set a bond of $10,000 and then
25      also held you in contempt and sentenced you to 93 days in

## Page 9

1   jail; is that accurate?
2   A   Yes.
3   Q   So after the arraignment, you were taken to the booking area
4       in the jail.
5   A   It was in the same room as the arraignment room.
6   Q   Now, there's also a video of -- a jail video of you in that
7       room after the arraignment. Have you seen that video?
8   A   No.
9   Q   Your hands were handcuffed behind your back, is that --
10      after the arraignment; is that correct?
11  A   I truly don't remember that.
12  Q   Do you remember anything about being in that room -- well,
13      let me -- strike that. Let me ask you this: Have you read
14      the report that was written by Mr. Griffith in this case?
15  A   No.
16  Q   Mr. Griffith in his report -- and this seems to be born out
17      by the video, but I'm just going to ask you if you remember
18      this. Your hands were handcuffed behind your back and then
19      the handcuffs that were attached to you were then attached
20      to a handcuff that was on a bench. Do you remember that?
21  A   Yes.
22  Q   Do you remember unscrewing the bolt that held --
23  A   Yes, I do.
24  Q   Why did you do that? Why did you unscrew that bolt?
25  A   Because it -- because it was loose. There was no --

## Page 10

1  Q  Just something to do?
2  A  Yes, because it was loose and I could.
3  Q  And then after you unscrewed that, you showed much more
4     flexibility than I ever could and you put your hands from
5     behind you under your legs to in front of you; correct?
6  A  I don't remember that part.
7  Q  If that's what the video shows, you don't have any reason to
8     dispute it; fair?
9  A  No; fair.
10 Q  Do you remember that after you unscrewed the bolt, two of
11    the correction's officers and a deputy came over and
12    re-handcuffed you to the bench?
13 A  Yes.
14 Q  And when they did that, do you recall that one of your hands
15    was handcuffed to one end of the bench and the other hand
16    was handcuffed to the other end of the bench?
17 A  Yes, I do.
18 Q  Did you have any discussions -- and I say "discussions."
19    Did you say anything to the deputies or to the CO's when
20    that was going on or did they say anything to you that you
21    recall?
22 A  The only thing -- I remember requesting to talk to mental
23    health. I don't know if it was at that time or prior, but,
24    yes.
25 Q  And you did then see someone from mental health; correct?

## Page 11

1  A  I did, yes.
2  Q  And the report says that her name is Anne Niemi. Do you
3     know if that was her name?
4  A  From being incarcerated after that, I do believe that that
5     was the same person and I ended up knowing her name in my
6     incarceration after that. So I believe that is her, yes.
7  Q  So were you taken from that area where you were handcuffed
8     to another part of the jail to see the -- the person from
9     mental health?
10 A  No.
11 Q  Where did you see the person from mental health?
12 A  Right where I was handcuffed.
13 Q  So she came down to that area?
14 A  Yes.
15 Q  When you asked to somebody from mental health, why did you
16    want to see somebody from mental health?
17 A  Because in my arraignment, McKay told me I couldn't have my
18    attorney there and then he wouldn't answer my questions
19    about my court date that I had at 2:00 o'clock. He just
20    told me that that's irrelevant, that I don't need my
21    attorney. And this is why I was cursing. And I wasn't
22    cursing at him. I was cursing in the words I was using.
23    And when I got sentenced to that 10 days and then when I
24    went off the camera to do my own thing, to look at my
25    paperwork, I said something under my breath. He asked what

## Page 12

1     I said. I was being honest with him. I told him what I
2     said. He didn't like that. He sentenced me to 92 days.
3        I was very -- in my mind, I was confused at why my
4     honesty led me to more time in jail when I was there for
5     something I originally didn't do. And I couldn't even go to
6     that court date. And I also couldn't have my attorney to
7     help me understand those things.
8  Q  So did you want to -- I mean, did you feel confused? Is
9     that why you wanted to talk to mental health?
10 A  I wanted to talk to them because I didn't understand how I
11    was in jail and how I was getting 92 days for being honest.
12 Q  And you thought they could shed some light on that?
13 A  I just didn't know what else to do. I wasn't -- I wasn't
14    sure that it was okay that that was happening.
15 Q  Were you angry would you say at that point?
16 A  No, I was just very confused.
17 Q  If you recall, who -- you said you wanted to talk to your
18    attorney. Do you remember who your attorney was?
19 A  Yeah, Gary Stewart.
20 Q  And, if you know, what happened with that afternoon court
21    appearance?
22 A  I don't know.
23 Q  Do you know what happened to that underlying charge that was
24    pending?
25 A  Yes, I ended up -- I ended up pleading guilty so I could get

## Page 13

1     out of jail after I was slammed on my head.
2  Q  And what was that underlying charge?
3  A  Domestic violence.
4  Q  And do you recall what judge you pled guilty in front of?
5  A  McKay.
6  Q  So based on the records, it appears that you were released
7     from Van Buren County Jail on January 22nd, which would have
8     been 10 days after you were first brought there. Is that --
9  A  That sounds about correct, yes, sir.
10 Q  So would you have pled guilty on the 22nd, do you think?
11 A  After I pled guilty, I was released within the hour, so I
12    believe so.
13 Q  And was Mr. Stewart with you when you pled guilty?
14 A  Yes, sir.
15 Q  And was that a personal appearance or was that also by
16    video?
17 A  I and Mr. Stewart was in front of McKay.
18 Q  Over in South Haven?
19 A  No.
20 Q  Or was that in Paw Paw?
21 A  In Van Buren, in Paw Paw.
22 Q  Now let me back up to the 12th. You asked to see mental
23    health and Anne Niemi from mental health came down to talk
24    to you; correct?
25 A  Correct.

**Page 14**

1  Q  How long did that interaction last, would you say?
2  A  I truly don't remember, but I remember her writing a full,
3     like, two pages. So enough for me to talk her ear off for
4     two pages.
5  Q  And you were telling her about what had happened to you?
6  A  Yes.
7  Q  According to the -- to the records, she recommended that you
8     be placed on suicide watch and placed in an anti-suicide
9     gown. Did she tell you that she was going to make that
10    recommendation?
11 A  No.
12 Q  Who told you that that was her recommendation?
13 A  Nobody.
14 Q  You were placed in an anti-suicide gown; correct?
15 A  Yes.
16 Q  And do you have a memory of that?
17 A  Yes, I -- once I was done talking with her, I remember them
18    saying, "You need to come back here and get into this."
19    Well, instead of having clothes, he had some mat looking
20    thing. And so I do remember that.
21 Q  And did they tell you why they wanted to put you in that?
22 A  No.
23 Q  Now, you said that you have since spoken to Anne Niemi under
24    other circumstances; correct?
25 A  Yes.

**Page 15**

1  Q  Did you ever talk to her about what occurred on that day?
2  A  No.
3  Q  On January 12th of 2018, were you being treated for any
4     mental health issue?
5  A  January 12th?
6  Q  Yeah.
7  A  No.
8  Q  Had you been treated for any mental health issue up to that
9     point in your life?
10 A  No.
11 Q  Did any of CO's tell you that Anne Niemi or mental health
12    had told them that you needed to be placed on suicide watch?
13 A  No.
14 Q  Did you consider yourself suicidal?
15 A  No.
16 Q  Did you ask them why you were being placed in the suicide
17    gown?
18 A  I asked why I had to be in this thing where my junk was
19    hanging out.
20 Q  And again I've seen the video, but tell me how your junk was
21    hanging out. I mean, was it in the front, on the side?
22 A  It's not that it was specifically hanging out that I was
23    worried about. It's that this is literally a mat with a
24    hole in it with velcro on the sides and the velcro was not
25    together. So I was just wide open to everything.

**Page 16**

1  Q  And did you complain -- you know who Josh Griffith is;
2     correct?
3  A  I do now. At that time, I did not. But, yes, it took me a
4     couple months in Van Buren County to realize which one it
5     was; yes.
6  Q  Did you complain to Josh Griffith or any other CO about the
7     suicide gown?
8  A  Yes, there was two officers in there at the time that I was
9     complaining; yes.
10 Q  One of them was Josh Griffith?
11 A  Yes, sir.
12 Q  Do you know who the other one was?
13 A  I think it was Tesser, but I truly don't --
14 Q  Did either of them tell you that once you got to the cell
15    that they would get you another gown or they would fix the
16    gown or something along those lines?
17 A  No.
18 Q  And I'm going to talk to you about the specific incident in
19    a minute, but you were taken to Lakeview Hospital for a cut,
20    a laceration on your head and you got three stitches;
21    correct?
22 A  Yes, sir.
23 Q  Now, in the -- in the Lakeview records, it's -- there's a
24    statement in there -- give me a second.
25    (Counsel reviews documents)

**Page 17**

1  Q  It says that you were placed in a body suit that was not
2     fastening correctly. You were asking for help with it and
3     the next thing you recall is waking up on the ground. Is
4     that accurate?
5  A  That's --
6  Q  Was it at the time?
7  A  I'm not -- that is accurate, but it is missing the part
8     about me complaining about my junk.
9  Q  But it -- do you remember the actual physical action that
10    caused the injury to your head?
11 A  No.
12 Q  What's the last thing you remember before that?
13 A  I remember an officer on the right of me and an officer at
14    the door and I remember talking about not understanding why
15    I'm -- this thing doesn't velcro. And then I woke up.
16 Q  There's also video of that part of your interaction at the
17    jail.
18 A  Yes.
19 Q  Have you seen that video?
20 A  No.
21 Q  When you got back from the hospital -- and again we're going
22    to talk about the incident itself in a little bit. But when
23    you got back from the hospital, it appears that you were
24    placed in the cell on suicide watch, is that your
25    understanding?

**Page 18**

1  A  I was in max cell -- in a max cell, yup. And now I know
2     that it was suicide watch, but even my whole 10-day stay I
3     didn't know that's what was happening.
4  Q  Did you ask them why you were in that cell as opposed to in,
5     you know, general population or any --
6  A  Yes, they told me I was on a medical hold because of my
7     scar; not like a hold, but like a medical observation
8     because of my scar.
9  Q  You're aware that Mr. Piper filed a Complaint in the court
10    on your behalf?
11 A  Yes.
12 Q  Have you seen that Complaint?
13 A  No.
14 Q  Okay.
15    (Deposition Exhibit 1 marked)
16 Q  Mr. Burnett, I'm going to show you what we've marked as
17    Exhibit 1, which is the Summons and the Complaint or at
18    least a copy of it that was filed on your behalf. And, if
19    you could, just take a -- you don't need to read it. I
20    just -- I'm going to -- after you see it, I'm going to ask
21    you if that refreshes your memory about whether you've seen
22    it before.
23 A  Okay.
24    (Witness reviews exhibit)
25 Q  Doesn't ring a bell?

**Page 19**

1  A  No; no, I've never seen it.
2  Q  There's some allegations in the Complaint -- it starts on
3     paragraph 13 here and goes through paragraph 16 that alleges
4     what happened in the incident itself. Could you read those
5     13, 14, 15 and 16 to yourself?
6     (Witness reviews exhibit)
7  Q  You've had a chance to read that?
8  A  Yes; yup.
9  Q  My understanding is that you don't have any independent
10    memory of the events; is that fair?
11 A  Yes.
12 Q  So whatever is -- is alleged in here is based on information
13    that Mr. Piper would have obtained from some other source;
14    is that --
15 A  Yes.
16 Q  So the next thing you remember was being on the floor?
17 A  Yes.
18 Q  Were you on your back, on your front, on your side; do you
19    recall?
20 A  I was on my face like this (indicating).
21 Q  And when you say "like this," your head was turned to the
22    side, but you were facedown on the floor?
23 A  I was belly down with -- I remember seeing the desk.
24 Q  Was somebody holding paper towel or a bandage or anything to
25    your head or not at that point?

**Page 20**

1  A  No, not when I first woke; unh-unh. When I first --
2  Q  Was anybody near you?
3  A  There was like 20 people around me it felt like.
4  Q  And could you tell what any of them were doing?
5  A  Standing there is what I thought.
6  Q  Do you have any way to judge how long you think you were
7     unconscious?
8  A  No.
9  Q  At some point, did somebody put pressure on this cut on your
10    head?
11 A  I don't remember that, but clearly we had to have, because I
12    was bleeding everywhere.
13 Q  Do you remember one of the -- one of the nurses coming down,
14    Roslyn Hickmott? Do you know who Roslyn is?
15 A  No.
16 Q  But do you remember a nurse providing some treatment to you
17    while you were in that room?
18 A  No.
19 Q  Do you recall how you were transported to Lakeview?
20 A  No; no, I don't, actually.
21 Q  Do you remember being at Lakeview and having the stitches
22    put in?
23 A  I don't remember the stitches, but I remember being on the
24    hospital bed and being shackled.
25 Q  Do you recall who from the jail accompanied you?

**Page 21**

1  A  No.
2  Q  Do you remember talking to the doctors or the nurses or
3     physician's assistant or anybody while you were at the
4     hospital?
5  A  I remember one of the nurses, I think she was, but I don't
6     remember, like, our conversation or anything of those
7     details.
8  Q  The Lakeview records show that you were given a CT scan
9     while you were at the hospital. Do you remember that?
10 A  I don't remember the CT scan, but now that you say that, I
11    do remember going down the hallway on a bed.
12 Q  Do you remember talking to --
13 A  You're actually bringing up things I haven't -- I didn't
14    even know I remembered, actually, just to be honest with
15    you.
16 Q  That's fine. And that's all I'm asking you to do. Do you
17    recall having any conversations with any of the medical
18    professionals about the results of any tests that they might
19    have done?
20 A  No.
21 Q  And you've not seen the Lakeview records, have you?
22 A  I do not believe so.
23 Q  The records state that when you left the hospital, no
24    prescriptions were requested or ordered as a result of your
25    treatment. Is that your memory? That is, that you

**Page 22**

1  didn't -- when you left the hospital, you didn't have a
2  prescription to take any medications?
3  A  That sounds fair.
4  Q  And before you were arrested on the 12th, were you taking --
5     I mean, had any medications been prescribed for you?
6  A  No.
7  Q  So when you did your jail intake and they asked you if you
8     have any prescriptions or any medications, you didn't have
9     any?
10 A  I said "no," correct.
11 Q  Do you remember having the sutures removed?
12 A  Yes.
13 Q  And where was that done; do you recall?
14 A  In the hallway.
15 Q  At the jail?
16 A  At the jail in the hallway outside of my cell.
17 Q  One of the nurses did that?
18 A  I believe so.
19 Q  And if you were in for 10 days, do you know how many days
20    along it would have been after you got them that they were
21    removed?
22 A  I want to say it was, like, the seventh or eighth day and I
23    remember that because I remember something about the doctor
24    saying that they should be removed within, like, five days
25    or they can grow into the scar.

**Page 24**

1  A  I did construction, but I specialized in siding.
2  Q  And where was the business located?
3  A  In Lawton.
4  Q  Out of your house?
5  A  Yes.
6  Q  Were you married at that time?
7  A  Yes.
8  Q  And what was your wife's name?
9  A  Constance Burnett.
10 Q  Do you recall when you were married to Constance?
11 A  The date we got married?
12 Q  Well, give me the year. How's that?
13 A  Yeah, 2015.
14 Q  Are you still married to Constance?
15 A  No.
16 Q  When were you divorced?
17 A  2018.
18 Q  Before or after your arrest in July?
19 A  Like December of 2018, so after.
20 Q  Were you married before you were married to Constance?
21 A  No.
22 Q  And you have two children?
23 A  One biological, but to me two children, yes, sir.
24 Q  So are those both Constance's children, then?
25 A  Yes, sir.

**Page 23**

1  Q  When they were removed, was there any difficulty removing
2     them?
3  A  No.
4  Q  At the time that you were arrested on January 12th, were you
5     employed?
6  A  Yes.
7  Q  And where did you work?
8  A  For myself, CB Builders, LLC.
9  Q  Stevie?
10 A  CB.
11 Q  Oh, CB? I'm sorry. CB Builders, LLC?
12 A  Yes.
13 Q  Did you have any employees at the company other than
14    yourself?
15 A  At that time, no.
16 Q  How long had that been an ongoing company?
17 A  For a year by that point.
18 Q  Okay.
19 A  Well, two years but one year on that name.
20 Q  And what was the name before that?
21 A  Custom Built.
22 Q  CB?
23 A  Yup.
24 Q  And what -- I think I probably know, but what was the
25    business of CB Builders, LLC?

**Page 25**

1  Q  Did you ever adopt the other child?
2  A  No.
3  Q  So you consider the other child one of your children, but
4     legally not one of your children?
5  A  Correct.
6  Q  Okay. Through CB Builders, did you have medical insurance?
7  A  No.
8  Q  Did Constance work at the time?
9  A  No.
10 Q  You testified that you were not under -- or you were not
11    receiving any prescription medications at the time you were
12    arrested in January of 2018; correct?
13 A  Correct.
14 Q  Did you have a regular family doctor that you would go to?
15 A  No.
16 Q  Do you recall the last time you would have been to a doctor
17    before your arrest on January 12th of 2018?
18 A  Probably sometime within -- well, that was -- I think the
19    last time I had been to the doctor was for a kidney stone
20    and I think that that was 2000- and -- the end of 2016.
21 Q  And do you know which doctor you went to?
22 A  No, just the ER in Paw Paw.
23 Q  There's also a reference in the medical records from
24    Lakeview that says that a Dr. Andrea Allman in November of
25    2016 directed you to take ibuprofen as needed for mild to

**Page 26**

1   moderate pain. Would that have been for the kidney stone?
2 A Probably, yes, sir.
3 Q And then there's also a note that you had been prescribed an
4   epi pen by Dr. Pearce, that's P-e-a-r-c-e, Dupuis,
5   D-u-p-u-i-s, in October of 2015. Does that ring a bell?
6 A I remember getting the epi pen, so I believe that my wife
7   had set that up more than likely so I don't know the
8   details, but, yes.
9 Q And do you know what the epi pen was prescribed for? You
10  have an allergy?
11 A Yeah, I have severe food allergies; yes.
12 Q To?
13 A To milk, peas, red meat; it's the type of protein and it's
14  sodium caseinate, I believe.
15 Q Have you ever had to use the epi pen?
16 A Not since I owned it, no, but I've needed one prior to that.
17 Q So at the time of your arrest, were you carrying an epi pen
18  with you?
19 A No.
20 Q Had you been carrying one with you for some period of time
21  or was it just at the house in case you needed it?
22 A Well, I actually had it in my vehicle, so at the time of the
23  arrest on that date, 2012, or January 12, yes, it was in my
24  car's glove compartment.
25 Q The intake form does state that you have a milk allergy,

**Page 27**

1   cheese, et cetera. And then -- so it says, "No milk
2   products," on your diet form. When you were brought into
3   the jail, did you tell them that you could have an
4   anaphylactic reaction to milk products?
5 A I told them I was severely allergic, like a bee sting type
6   of allergic, yes.
7 Q And is that also true when you were brought into the MDOC
8   custody? Is that their information about you as well?
9 A Yes.
10 Q And have you had a severe allergic reaction since you've
11  been in DOC custody that's required epinephrine?
12 A No; no.
13 Q So after your release from the Van Buren County Jail roughly
14  January 22nd after your guilty plea -- and let me ask you
15  about that. So you pled guilty to the underlying domestic
16  violence charge; is that right?
17 A Correct.
18 Q And as part of that guilty plea, Judge McKay released you
19  from the rest of your 93-day sentence for contempt?
20 A Correct.
21 Q And sentenced you to time served on the domestic violence
22  guilty plea?
23 A He didn't sentence me that day. I had to come back in
24  February 21st, I think, to be sentenced for that plea.
25 Q And then what was -- what was the sentence for that?

**Page 28**

1 A The plea agreement for that was six months misdemeanor
2   probation to wipe the charge out, I believe, and also part
3   of the plea agreement was to serve my remaining time in
4   jail. He didn't just let me out. I had to serve that doing
5   work crew. So that was the plea agreement, but that was not
6   my sentence.
7 Q What was your sentence?
8 A Well, when I went back on February 21st, he pulled my plea
9   and sentenced me to a year of probation and made me serve
10  the rest of my 92 days in jail instead of allowing me to do
11  my work crew.
12 Q So were you taken from the hearing back to the jail?
13 A From when I pled guilty?
14 Q Yeah.
15 A Yes.
16 Q And back to Van Buren County?
17 A Yes.
18 Q So then how long were you in -- at the Van Buren County Jail
19  that time from February 21st until when?
20 A Okay. 48 days after trustee time.
21 Q So sometime in April you would have been released?
22 A I believe so, April. I don't remember the date.
23 Q When you were brought back to the jail that time, were you
24  taking any medications?
25 A No.

**Page 29**

1 Q During that period of time is when you started talking to
2   Anne Niemi?
3 A No.
4 Q When did you start talking to Anne Niemi?
5 A When I became incarcerated in July.
6 Q In late February, March, before your release in April in
7   that time period, did you have any interactions with Josh
8   Griffith?
9 A No, we had just seen each other or whatever; nope.
10 Q Ever talk about what happened on January 12th with him?
11 A No.
12 Q Did you talk to any other CO about what happened on January
13  12th?
14 A Just a couple had mentioned that they had seen what
15  happened, but no details.
16 Q Then after your arrest in July --
17 A Speaking of that, though --
18 Q Yeah, go ahead.
19 A I worked in the kitchen. The kitchen lady said that it was
20  crazy, that she thought someone had died because of the way
21  they were acting and stuff like -- and which the kitchen is
22  right across from that room. That's the first time I found
23  out that I was knocked out for such a long time. She said
24  that it was wild, that it -- that they didn't know what was
25  going on for -- she seemed like -- like 30 minutes. She

**Page 30**

1  said it seemed like I was knocked out for forever. That's
2  when I kind of first started hearing about the details is
3  when I was working in the kitchen and the kitchen lady was
4  telling me anything about it.
5  Q  Do you remember the kitchen lady's name?
6  A  No. She was -- I don't know if it makes a difference, but I
7     think she was fired by the time of my next day. And she was
8     also a skinny, older lady and the other two were kind of
9     bigger. So I guess if that --
10 Q  Could you tell you that she could see you from where she
11    was?
12 A  She said that she had seen a person on the ground and the
13    officer was in there and there was blood all over the place.
14    She said it looked like a murder scene.
15 Q  So then after you were released in April, were you back in
16    the jail for any reason before your arrest in July?
17 A  No.
18 Q  So you were arrested in July and then you were in the jail
19    from that time until you pled guilty and were sentenced and
20    then were transferred to the DOC custody?
21 A  Yes.
22 Q  During that period of time while you were at the jail, did
23    you have any interactions with Josh Griffith?
24 A  No talking, just seen him and stuff.
25 Q  Did you talk to any other CO's or any other jail employees

**Page 31**

1  about the incident on January 12th?
2  A  No.
3  Q  The Complaint alleges that you have migraine headaches as a
4     result of the incident on January 12th, is that accurate?
5  A  Yes, it is.
6  Q  Has a doctor diagnosed you with migraines?
7  A  No.
8  Q  Tell me what happens and what symptoms do you have that you
9     characterize as migraines?
10 A  It starts to hurt so severely in the -- it's in the back of
11    my head. And then I guess it's closer to the spine. And
12    it's like an overwhelming pain like a stabbing pain. And
13    then sometimes it actually puts me to sleep, not like I just
14    fall out and go to sleep, but it's so severe I have to lay
15    down and go to sleep.
16 Q  Do you still get them, those headaches?
17 A  Yes.
18 Q  How often do you get them?
19 A  That severely, probably like every couple months.
20 Q  Has the frequency changed over time? Gotten more frequent
21    or less frequent?
22 A  More frequent.
23 Q  So in the immediate aftermath of January 12th, how often
24    were you getting headaches that severe?
25 A  I had probably only had a couple up until -- well, I'm not

**Page 32**

1  really sure. Say it one more time.
2  Q  Sure. You said they were become more frequent; right?
3  A  Yes.
4  Q  And now you get them a couple times a month?
5  A  That severe, yes; yeah.
6  Q  When did they start getting so that they were a couple times
7     a month as opposed to less frequently than that?
8  A  I'm not exactly sure. Since then, I've had the migraines,
9     but they haven't started getting that severe until, like,
10    the past year. And then when they do get that severe, it's
11    like every month or every two months, it seems like. But I
12    still get them on a normal basis; probably like once a week
13    or a little more.
14 Q  But not so severe that they cause you to go to sleep?
15 A  Correct.
16 Q  Same place in the back of your head near the spine?
17 A  Yes, it always seems like it's on the left side of that;
18    yes.
19 Q  Do you recall the first time you got one of those headaches?
20 A  Yeah, I don't remember the specific time; no. I do remember
21    it was between -- it was after I was released to 10 days, I
22    remember getting my first one probably like a week after
23    that.
24 Q  So it was after your release in January, but before you
25    were -- McKay put you back in jail in February?

**Page 33**

1  A  Yes; yes.
2  Q  And then -- and it -- how severe was that one in
3     relationship to the ones that put you to sleep?
4  A  Well, I think the one that ended up making me end up going
5     to the hospital was that severe, but I was having them more
6     frequently that was starting to worry me. And then when I
7     had ones that severe, I don't know if it was more than one,
8     but that's actually when I ended up going to the hospital
9     because I was concerned.
10 Q  And when was that? When did you go to the hospital?
11 A  I honestly don't know that date, but I want to say it was
12    probably -- I remember messaging this girl around
13    Valentine's Day so it was probably like February 7th I went
14    to Kalamazoo Jail -- or to Kalamazoo Hospital.
15 Q  So again it was before you pled guilty and were put back in
16    jail by McKay in February?
17 A  Yes.
18 Q  And which hospital did you go to?
19 A  The downtown Kalamazoo one.
20 Q  Bronson?
21 A  I honestly don't know. I think so. The one off of River --
22 Q  Oh, Riverview? Bronson is right downtown. Borgess is,
23    like, up off of Gull Road. I don't know if that helps you.
24 A  Yes, the one right downtown, so Bronson; yup.
25 Q  Did you go there alone?

### Page 34

1  A  Nope, I brought the girl I was talking about.
2  Q  Do you remember her name?
3  A  Yes, Amanda.
4  Q  Do you remember her last name?
5  A  Baker.
6  Q  Was there insurance that would have covered that?
7  A  No.
8  Q  Medicaid or don't you know?
9  A  No, I didn't have no Medicaid or nothing.
10 Q  And were you admitted to the hospital or just seen in the
11    emergency room?
12 A  I was just seen in the emergency room and I was also having
13    vision problems where things would almost get to where I
14    couldn't see, like, blurriness-wise. But I could still
15    function and stuff, just it would be from clear to blurry
16    for extended periods of time. And they had set up a time
17    for me to go see a neurological doctor.
18 Q  Okay. Did you see the doctor?
19 A  No, because I -- I ended up getting incarcerated in
20    February.
21 Q  When you went to Bronson with the headache, what did they do
22    for you?
23 A  I'm not sure if they prescribed me any medicine, but they
24    just -- they set up the appointment with the specialist.
25 Q  And before you could go to the specialist, you were

### Page 35

1     re-sentenced by McKay in February?
2  A  Yes.
3  Q  When you were brought back to the jail then, did you tell
4     the staff on intake that you had these issues and that you
5     were scheduled to see a neurologist?
6  A  Yes.
7  Q  And what -- what, if anything, happened as a result of that?
8  A  Nothing happened, they didn't care. I mean, that's my
9     understanding. They didn't make -- you know, you can say
10    whatever you want in there, but I was in jail.
11 Q  Did you ask them that you -- you know, did you tell them,
12    "I've got this appointment. I need to keep it"?
13 A  Yes, I did.
14 Q  Do you know who you talked to?
15 A  I remember talking -- no, but I remember telling people
16    because it was important to me. And it was like the next
17    day I remember after I got -- I don't remember when it was
18    scheduled, but I remember it being either that same day or
19    the next day that I was sentenced and they put me in jail
20    again.
21 Q  So then after you were released in April, did you follow-up
22    and make another appointment with a neurologist?
23 A  Yes, I did.
24 Q  And did you that keep that appointment?
25 A  No, I ended up -- I ended up going to jail again.

### Page 36

1  Q  Okay.
2  A  But in Cass County.
3  Q  And when was that?
4  A  My appointment was like May 7th or something like that and I
5     had went to jail, I want to say, May 4th. And I was there
6     for, like, six days.
7  Q  And what was that for?
8  A  For being with my wife. But I was incarcerated, though, for
9     driving without a license, driving with no insurance and
10    driving on a suspended license. That's why I was
11    incarcerated.
12 Q  So just -- I want to make sure I understand, Mr. Burnett.
13    When you say "for being with your wife," it was because you
14    were driving to get to your wife or was there a PPO? I'm
15    not sure what you meant when you said, "For being with my
16    wife."
17 A  Well, because I pled guilty to the domestic violence, I
18    could not be around my wife legally. But we were seeing
19    each other and I was in the house and the police came and
20    arrested me, but they didn't arrest me on the charges of a
21    PPO violation or anything. They arrested me on driving.
22 Q  Do you know how they -- did they have a warrant?
23 A  No.
24 Q  How did they come to the house to arrest you?
25 A  My wife said that her friend said that I was there.

### Page 37

1  Q  So your understanding is that Constance -- one of
2     Constance's friends called the police, told the police that
3     you were with Constance and that you weren't supposed to be
4     with Constance?
5  A  Correct.
6  Q  So the police showed up, asked for your license or some
7     identification?
8  A  No, they just woke me up. I was sleeping on my couch.
9  Q  And where was this?
10 A  In her apartment in Three Rivers.
11 Q  Do you know, how did you end up --
12 A  No, in Dowagiac.
13 Q  So what happened to those charges?
14 A  Well, they ended up getting dropped obviously because they
15    weren't real.
16 Q  So they arrested you for driving with a suspended license,
17    no insurance and what was the other thing? Expired license
18    or something?
19 A  Expired license, yup, something like that.
20 Q  What department was that; do you know?
21 A  Well, it was Cass County, but I think it was the Dowagiac
22    police officer.
23 Q  And then they lodged you at the Cass County Jail; right?
24 A  Yes.
25 Q  And did you have an attorney appointed for you?

**Page 38**

1  A  Yes.
2  Q  And who was that; do you remember?
3  A  No, because I did not have a permanent attorney over there
4     in Cass. They do a temporary arraignment attorney until you
5     get an attorney.
6  Q  So when were the charges dismissed? At the arraignment or
7     after or before?
8  A  They were all dismissed except for the driving without a
9     license. They had me do a $300 bond. And then I'm not -- I
10    bonded out. I'm not sure when they dismissed them, because
11    I didn't go back to court.
12 Q  And your memory is that you were supposed to have gone back
13    to see the neurologist sometime early in May but you were in
14    the Cass County Jail when that appointment was scheduled?
15 A  Yup.
16 Q  So when you got back out of the Cass County Jail after --
17    you said you were there for how long? Six days?
18 A  Six days.
19 Q  Did you set up or try to set up another appointment with a
20    neurologist?
21 A  No.
22 Q  When you were booked in to the Cass County Jail, did you
23    tell them about your medical history and the fact that you
24    were supposed to see a neurologist?
25 A  I truly don't remember.

**Page 39**

1  Q  So between -- all right. You made one visit to the
2     emergency room at Bronson that we just talked about?
3  A  Yes.
4  Q  Between then and your arrest in July on a home invasion
5     charge, did you see any other doctors?
6  A  No.
7  Q  Your best memory is you had not been prescribed any
8     medication during that period of time?
9  A  Correct.
10 Q  So when you were arrested in July and then you were at that
11    point again booked into Van Buren County Jail; correct?
12 A  Yes.
13 Q  Did you again tell them about your history and the headaches
14    and the blurred vision?
15 A  I don't remember talking to them for actually quite some
16    time.
17 Q  Well, when you were first booked in, they go through a
18    booking process; right?
19 A  Right.
20 Q  And they ask you about allergies and that sort of thing;
21    right?
22 A  Yeah, I was --
23 Q  And your medical history?
24 A  Yup.
25 Q  Did you tell them at that initial booking about your

**Page 40**

1     headaches and your blurred vision?
2  A  I honestly don't know. By that time I was fed up so I
3     didn't tell them absolutely nothing.
4  Q  Have you been treated by any medical professional through
5     the Department of Corrections for your headaches?
6  A  No.
7  Q  And have you -- and I don't know what the process is, but if
8     have a medical issue, do you do a kit (sic) and ask for
9     treatment? How does that work?
10 A  Yup, you do a kite and ask for medical treatment.
11 Q  Have you done that for your headaches?
12 A  No, because I'm trying to save up money to get other things
13    I need. They charge you $5.
14 Q  For a medical visit?
15 A  Yes.
16 Q  What if you don't have it?
17 A  They charge it to you anyway.
18 Q  So you could end up with a negative account? It's not that
19    they're -- you're not going to see a doctor, you're just
20    going to end up with a negative balance on your account?
21 A  Correct; yup. But the reason why I haven't kited about
22    any -- because I also have severe lower back pain and this
23    is since that incident too. I don't know if it has anything
24    to do with that or not. But I haven't been kiting them
25    about that either because I want -- you know, I just want

**Page 41**

1     stuff in here. I want shoes and stuff like that and that
2     stuff costs money and they want to charge you. It's just a
3     big hassle. It's not efficient.
4  Q  When did the low back pain start?
5  A  That started sometime that severely since like three months
6     in to my stay since July, so probably around September of
7     2018.
8  Q  Was there any event that triggered that or did it just start
9     to hurt?
10 A  It just -- it just got increasingly bad to a point where I
11    had to ask the -- I had to kite the nurse and ask what was
12    going on or whatever.
13 Q  And did you get any medication for that? Ibuprofen or
14    anything?
15 A  Yeah; yup, they had started me on a little treatment plan
16    with that kind of stuff.
17 Q  And did that help?
18 A  No.
19 Q  Did you tell them it didn't help?
20 A  Yeah.
21 Q  Did you -- were you ever seen by anyone other than someone
22    on the nursing staff?
23 A  They did end up getting me an x-ray and stuff like that,
24    yes.
25 Q  And was that at Lakeview also?

**Page 42**

1 A They actually have the x-ray machine come there.
2 Q Did you talk to a doctor about what the results of the x-ray
3   were?
4 A Yeah, they said that everything looks fine with my back or
5   whatever.
6 Q And let me ask you, Mr. Burnett, during the time from late
7   January when you were released -- right? -- the first time?
8 A Uh-huh (affirmative).
9 Q -- until July, were you still operating your business?
10 A No.
11 Q Did you --
12 A I lost -- actually the time that I was incarcerated for the
13   12 days, I lost my house and all of my tools.
14 Q Were they repossessed?
15 A My tools were stolen from my employees that -- that's why I
16   said I had no employees at the time because there was
17   issues. And my house was taken because I rented it and he
18   took advantage of the opportunity that I was incarcerated
19   and -- I don't know how you would say it, but took over my
20   home.
21 Q Who was that?
22 A I don't know his name. I have -- he sued me, though, so
23   it's in records somewhere.
24 Q So was that the house in Lawton?
25 A No, that was a house on -- on Van Kal, 22nd Street.

**Page 43**

1 Q So you owned that house?
2 A I was renting it. I did not own that.
3 Q So you were renting it from someone else?
4 A And when I got incarcerated for them 12 days, by the time I
5   got out, I had no more house.
6 Q He had evicted you?
7 A He just straight up moved -- he straight up took it over.
8 Q So he moved your stuff out and moved himself in?
9 A I guess. None of my stuff was there no more.
10 Q Where were you -- where were your tools when they were
11   stolen?
12 A They were on the job site.
13 Q Which was where.
14 A In Kalamazoo.
15 Q In a residence?
16 A Yeah, a residential area; a plat or whatever they were
17   called.
18 Q So it was a new construction?
19 A Yeah.
20 Q So you didn't -- and you had -- you were subcontracting some
21   work there?
22 A Yes, sir.
23 Q And you had had your tools there and when you were
24   incarcerated, the people that were supposed to be working
25   for you stole your tools?

**Page 44**

1 A I believe so, yes.
2 Q Did you ever file a police report about that?
3 A Yes.
4 Q Would that have been Kalamazoo Public Safety or Kalamazoo
5   Sheriff; do you know?
6 A Nope; nope, it -- I'm not -- now I feel like I'm lying. I'm
7   not trying to lie.
8 Q Oh, no --
9 A I think that -- I don't know if the tool thing happened
10   during that 12 days. So I'm thinking that was sometime in
11   December. This all happened -- I don't know the exact dates
12   on that. The only thing I know that happened during those
13   12 days was the house thing. The tools might have happened
14   prior to that. So I just -- I don't want to lie. I'm just
15   trying to tell the truth.
16 Q That's fine. I appreciate that. So really you didn't work
17   at all in '18 because you didn't have any tools; right?
18 A I think so, yes, sir; yeah, because my last paycheck was in
19   December sometime. So, yeah, by the time of '18 I would
20   have had been doing no legal work as far as cash.
21 Q Now, the complaint also alleges that you've had personality
22   changes; is that accurate?
23 A From my understanding, yeah.
24 Q And describe that for me.
25 A Well, I don't know how to describe a personality change from

**Page 45**

1   my own perception, but I've never been a very violent person
2   or anything, but once that stuff happened, I felt like no
3   one would help me, like no one could stop these people from
4   taking me to talk because they were the police. They could
5   do whatever they want. They clearly did it. I thought in
6   my mind the only thing I could do to protect myself was tell
7   myself that if I had to kill my way out then I would kill
8   somebody if I had to to not be incarcerated again.
9      And that really affected the way I was thinking
10   because I did not -- I didn't want to do that, but I was
11   trying to convince myself to keep going every day and to not
12   just hide.
13 Q To keep going where? Oh, you mean just to keep living your
14   life?
15 A Yeah; yeah, I couldn't even -- I was too afraid to be in the
16   car because I thought that they were going to pull me over
17   and take me back to jail again. But I had to keep moving.
18   I had to keep trying to live my life. And in order to do
19   that, I had to convince myself that I would do whatever it
20   took.
21 Q So I just want to make sure that I understand the sequence.
22   You were incarcerated for 10 days in January and we talked
23   about that. That's when you got the cut on your head;
24   correct?
25 A Yes, sir.

### Page 46

1  Q  And you were incarcerated again at the end -- towards the
2     end of February, all of March and part of April; is that
3     right?
4  A  Correct.
5  Q  And then you were incarcerated again for six days in Cass
6     County at the beginning of May?
7  A  Yes.
8  Q  And then you were -- you've been incarcerated since your
9     arrest on July -- I think it was 28th, but late July for the
10    home invasion charge; correct?
11 A  Yes.
12 Q  Were you incarcerated at any other times in 2018 that we
13    haven't talked about?
14 A  I don't believe so.
15 Q  The Complaint also alleges that you believe you're suffering
16    from posttraumatic stress disorder?
17 A  Yes.
18 Q  Has that ever been diagnosed by a medical professional?
19 A  No.
20 Q  What leads you to believe that you're suffering from PTSD?
21 A  I don't actually know. It's like the -- me thinking that or
22    me having to convince myself to go to -- to go every day --
23    like, the part about me saying that I would -- was willing
24    to hurt somebody, I never used to think like that. I never
25    thought that hurting someone would be acceptable. And even

### Page 47

1     during that time frame, I didn't think that it was
2     acceptable. But I didn't see any other way to prevent
3     myself from being put in that situation again. So I would
4     have -- from my perspective, that would have to be what I
5     would think.
6  Q  So you've been convicted of first degree home invasion. You
7     were convicted of -- on a guilty plea. You were also
8     convicted on a guilty plea of -- I'm assuming it was
9     misdemeanor domestic violence?
10 A  Yes.
11 Q  Do you have any other convictions?
12 A  Yes, a fleeing and eluding that happened in like -- like May
13    4th or something.
14 Q  Of '18?
15 A  Yes.
16 Q  Was that related to any of the charges that you ended up in
17    Cass Couthy Jail for?
18 A  No, I just -- I ran because I had warrants for my arrest for
19    not reporting to -- I knew I didn't report to my year
20    probation thing, so I figured I had warrants and so I ran so
21    I wasn't incarcerated.
22 Q  Was that before you were arrested in Dowagiac?
23 A  After.
24 Q  So it was after you were let out for the six days?
25 A  Yup.

### Page 48

1  Q  Who arrested you? What agency arrested you then?
2  A  For what?
3  Q  For the fleeing and eluding?
4  A  I got away.
5  Q  Okay.
6  A  No agency arrested me for that.
7  Q  Maybe I misunderstood. But you ultimately were convicted
8     for it?
9  A  Because when I -- I got away because I crashed my car and
10    fled on foot. So after that I had a warrant for my arrest.
11 Q  For fleeing and eluding?
12 A  For fleeing and eluding, which I ended up getting
13    incarcerated on July 28th and they charged me with that on
14    top of the home invasion first degree.
15 Q  So just to make sure that the record's clear, so when you
16    were arrested on July 28th for the home invasion, there was
17    an outstanding warrant for the fleeing and eluding?
18 A  Yes, sir.
19 Q  So when they charged you with the home invasion, they also
20    charged you with the fleeing and eluding?
21 A  Yup, they tried to work out a deal or whatever with them.
22 Q  Was that part of your guilty plea, that the fleeing and
23    eluding would be dismissed?
24 A  No; no, I thought I was getting set up so I didn't take the
25    plea deal that would have gave me a lot less years.

### Page 49

1  Q  So you did -- you did plead guilty?
2  A  Yes, sir.
3  Q  What was the consideration? I mean, what -- did you get a
4     lower sentence than you otherwise could have? Is that why
5     you pled guilty?
6  A  No, I pled guilty because the last chance for me to take the
7     deal that would have only gave me, like, four years in
8     prison for the home invasion -- I don't know if that's the
9     right number. I think it was four years or four and a half
10    or something. That same day that I was still not wanting to
11    take it. The prosecutor said, "Well, we still have the case
12    of fleeing and eluding. If he's not going to take this plea
13    today, we're going to separate that and go ahead and run the
14    trial next week." And my attorney, Gary Gabry, said that --
15 Q  I don't need to know what you -- unless he said it out loud,
16    don't tell me what Mr. Gabry told you. Okay?
17 A  Okay. Well, either way, he wasn't going to fight for me, so
18    I said, "Let's plead guilty to that." Because he said he
19    had no case to go to trial for that.
20 Q  So were you -- were you given a separate sentence for the
21    fleeing and eluding?
22 A  Yes, 270 days, I think.
23 Q  And was that a Van Buren County charge?
24 A  Yes.
25 Q  So when you were incarcerated from July until you

### Page 50

1  transferred to DOC, you were serving that term?
2  A  As well.
3  Q  Does the time you serve in DOC count towards that as well?
4  A  Yeah, that's --
5  Q  So you've served your term?
6  A  That's already been time served, yes, sir.
7  Q  Any other convictions -- any convictions before 2018?
8  A  When I was a minor.
9  Q  But nothing since you turned 18 until 2018?
10 A  Correct.
11 Q  Are you a high school graduate?
12 A  I actually dropped out and got my GED prior to my graduation
13    date.
14 Q  Where did you go to high school?
15 A  Paw Paw High School.
16 Q  And where did you get your GED? Is that through Paw Paw?
17 A  I believe the name is Kalamazoo Community Center.
18 Q  And when did you get your GED?
19 A  I would have graduated in 2018. I got my GED -- not 2018,
20    2008. I believe I got my GED when it was 2007, but because
21    I wasn't 18 yet, I had to wait until my 18th birthday.
22 Q  Have you taken any other formal education after you received
23    your GED? Any classes anywhere?
24 A  Yeah, I went to KVCC and I did, like, two years of the
25    automotive technology program or something, I think it's

### Page 51

1     called; automotive tech program.
2  Q  Did you get a certification?
3  A  No.
4  Q  Do you recall what years you would have been at KVCC?
5  A  Probably like 2009 to 2011 on and off.
6  Q  Did you ever work as a mechanic?
7  A  I've worked on cars but not as far as a career or pay.
8  Q  Before you started your own construction company, did you --
9     did you work for any construction companies?
10 A  Yes, I worked for -- the one right before that was Hometex,
11    which was my dad's company. I worked for him. And then the
12    one before that was road construction, not house
13    construction, and that was RedStone Construction in
14    Redfield -- or in Little Rock, Arkansas.
15 Q  When did you work for RedStone?
16 A  Around, like, 2011 to 2014, something like that. Those may
17    fluctuate a little bit, but, yeah.
18 Q  And you were obviously living in Arkansas during that period
19    of time?
20 A  Yes.
21 Q  Do you have any convictions in Arkansas?
22 A  No.
23 Q  And when you moved back to Michigan -- well, did you work
24    for your dad before or after you worked at RedStone?
25 A  After.

### Page 52

1  Q  So when you moved back to Michigan, you went to work for
2     your dad's construction company?
3  A  Yup.
4  Q  And how long did you work there?
5  A  Until 2016, so about 2014 to 2016.
6  Q  And what did you say that it was -- Hometex?
7  A  Hometex.
8  Q  And that was residential construction?
9  A  Yes.
10 Q  Have you had any medical treatment through the Department of
11    Corrections?
12 A  No.
13 Q  As far as you know, did -- have you received any sort of
14    medical classification from DOC?
15 A  I'm in outpatient therapy, which means I work with a
16    psychiatrist. It's really hard. There will -- I can tell
17    that she's starting to hear me. It takes time for them to
18    actually hear a prisoner. I don't know if you know what I'm
19    saying, but some people just come to these psychiatrists and
20    say whatever to get on drugs or something like that. I
21    think she's actually starting to listen and communicate with
22    me. So I believe there was actually -- she was just -- I
23    just seen her yesterday and she was talking about some type
24    of pills and that really actually -- I'm not a big fan of
25    doing that, but, you know --

### Page 53

1  Q  When did you start seeing a psychiatrist?
2  A  As soon as I could, so as soon as I got incarcerated in
3     MDOC. I see him monthly.
4  Q  And how does that work? Do they have to screen you and
5     approve you to see -- to be seen or can any --
6  A  I believe so, they -- like, in quarantine, they all screen
7     you and then -- yup, and then I had -- yeah, now they're
8     seeing me for therapy.
9  Q  And do you know what it is you're being seen for?
10 A  For depression, PTSD, yup.
11 Q  So do you know if this -- do you remember the psychiatrist's
12    name, by the way?
13 A  Domico, D-o-m-i-c-o.
14 Q  And where do you -- do you know her first name?
15 A  No.
16 Q  Where do you see her? Here at the prison?
17 A  Yes, sir.
18 Q  How often?
19 A  Once a month as of right now and that's actually not enough
20    for me, so I started -- I talk to the chaplain. He's going
21    to allow me to kite him like once a month too so I can get
22    two kind of sessions too.
23 Q  And that -- do you have to pay for those sessions?
24 A  No.
25 Q  Do you know why it's -- why you don't have to pay for those,



```
 1     but you would have to pay to see a doctor about your back?
 2  A  I do not.
 3  Q  Do you know -- so presumably it's Dr. Domico?
 4  A  Yes.
 5  Q  Has Dr. Domico diagnosed you with PTSD; do you know?
 6  A  No.
 7  Q  Has she diagnosed you with depression?
 8  A  She hasn't diagnosed me with any diagnosis.
 9  Q  But you specifically asked to be seen by a psychiatrist;
10     correct?
11  A  Yes.
12  Q  And was it for depression or -- I mean, what is it that you
13     told them you needed to be seen for?
14  A  I told them that my family thinks that I have some mental
15     issues and I agree with them because of the way I was
16     thinking prior to coming in here was leading me down the
17     path led me here. So I clearly believe them and I think I
18     should get help.
19        MR. BOGREN: I don't have any other questions, Mr.
20     Burnett. Thank you.
21        MR. PIPER: No questions.
22        (Deposition concluded at 2:33 p.m.)
23
24            -0-0-0-
25
```

Page 54



```
 1
 2
 3
 4
 5          I certify that this transcript, consisting of 54 pages, is a
 6     complete, true and correct record of the testimony of Dillon
 7     Burnett held in this case on February 20, 2020.
 8          I also certify that prior to taking this deposition, Dillon
 9     Burnett was duly sworn to tell the truth.
10
11
12
13
14
15
16
17
18     March 4, 2020
19
20                                   Emilee Nielsen, CER-9361
                                     Notary Public, State of Michigan
21                                   County of Montcalm
                                     My commission expires 05/2024
22                                   Network Reporting Corporation
                                     2604 Sunnyside Drive
23                                   Cadillac, Michigan 49601-8749
24
25                                           Page 55
```