UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DILLON BURNETT,

          Plaintiff,                               Hon. Hala Y. Jarbou

v.                                       Case No. 1:19-cv-257

JOSH GRIFFITH,

          Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff Dillon Burnett has sued Defendant Josh Griffith pursuant to 42 U.S.C. § 1983, alleging that Griffith violated his constitutional rights by using excessive force on Burnett at the Van Buren County Jail on January 12, 2018. Burnette also alleges a state-law claim of assault and battery. The matter is before the Court on Griffith's Motion for Summary Judgment. (ECF No. 31.) Pursuant to 28 U.S.C. § 636(b)(1)(B), I recommend Griffith's motion be **GRANTED**.[1]

### I.  Background

On January 12, 2018, Burnett was arrested on an outstanding warrant for failure to appear and transported to the Van Buren County Jail. (ECF No. 32-1 at PageID.77.) Defendant Griffith, a Van Buren County Corrections sergeant, was on duty as the booking officer when Burnett and the arresting officer arrived at the jail. (ECF No. 32-3 at PageID.90.) After being booked into the jail, Burnette was arraigned by video by District Court Judge Michael McKay. (ECF No. 32-1 at PageID.77.) Griffith operated the video for the arraignment and stood next to Burnett. (ECF No.

---

[1] The Court denies Burnett's request for oral argument because the issues are adequately briefed, and oral argument would not further assist the Court in reaching a decision.

32-3 at PageId.91–92.) During the arraignment, Burnett became angry and argued with Judge McKay about his bond. Based on Burnett's conduct, Judge McKay sentenced Burnett to 93 days in jail for contempt of court.[2]  (ECF No. 32-1 at PageID.77–78; ECF No. 32-3 at PageID.92–93.)

After the hearing, Burnett appeared frustrated and upset with Judge McKay's imposition of the sentence on the contempt conviction. (ECF No. 32-3 at PageID.93.) Burnett sat down against the wall in the booking room and stated that if he found out that any officer had assaulted an inmate at the jail, he would assault the offending officer. (*Id.* at PageID.94.) Burnett stood up, and Griffith handcuffed Burnett's hands behind his back and secured the handcuffs to an eye bolt on the bench of a steel picnic-type table in the booking room. (*Id.* at PageID.95.) While seated on the bench for about ten minutes, Burnett used both hands to unscrew the bolt securing his handcuffs to the bench and pulled his arms under his legs and in front of his body. (ECF No. 32-1 at PageID.78; ECF No. 32-3 at PageID.96.) Noticing Burnett's activity, Griffith and two other officers responded immediately and re-secured Burnett's hands to the picnic table by handcuffing each wrist to a different end of the bench so that his hands were separated. (ECF No. 32-3 at PageID.97.) Because other inmates' property was located nearby, Griffith wanted to ensure that Burnett could not access that property and obtain something that he should not possess. (*Id.* at PageID.98.)

While secured to the bench, Burnett requested to speak with someone from mental health. (ECF No. 32-1 at PageID.79.) Griffith or another officer arranged for Ann Niemi of the Van Buren County Community Mental Health Department to speak with Burnett and perform a mental health assessment. (ECF No. 32-1 at PageID.79–81.) After Niemi finished speaking with Burnett, she advised Griffith that Burnett needed to be placed on suicide watch. (ECF No. 32-3 at PageID.99.)

---

[2]  Griffith has submitted a DVD that contains three video segments, one of which is the arraignment before Judge McKay. (ECF No. 32-2.)

Griffith then asked Officer Tessar for assistance in placing Burnett in a suicide gown and unhooked Burnett from the bench and took him to a changing area within the booking room to put on the suicide gown. (*Id.* at PageID.100.) Burnett initially refused to put on the gown, but eventually did so. (ECF No. 35-7 at PageID.162.) Burnette complained to the officers that his penis was exposed because the Velcro on the side of the gown would not stay fastened. (ECF No. 32-1 at PageID.83.)

After Burnett was in the gown, Griffith placed the handcuffs on Burnett with his hands behind his back to be escorted to another cell. (ECF No. 32-3 at PageID.101.) Griffith escorted Burnett as Officer Tessar went ahead to open the door leading out of the booking room. As Griffith and Burnett approached the door, Burnett continued to complain about the gown being open. (ECF No. 32-1 at PageID.83; ECF No. ECF No. 35-1 at PageID.140.) Suddenly, Burnett pulled away to the right and tried to go in the opposite direction toward the inmate property and the bench on which Burnett had been restrained. Griffith tried to regain control of Burnett. As Burnett continued to pull away, Griffith pulled Burnette across his body and took Burnette to the floor. (ECF No. 32-3 at PageID.101; ECF No. 35-1 at PageID.140.) Griffith went to the floor in a kneeling position, and he and Officer Tessar attempted to control Burnett. Griffith noticed that Burnett had a laceration on his forehead and was bleeding. (ECF No. 32-3 at PageID.104–05.) Griffith retrieved some paper towel and applied it to Burnett's forehead. (ECF No. 35-1 at PageID.140.) A few minutes later, a nurse arrived from health care and advised the officers to take Burnett to the hospital to be treated. (ECF No. 35-8 at PageID.185.) Burnette was taken to the Emergency Room at Lakeview Hospital and received three stitches. (ECF No. 32-1 at pageID.82.)

Burnett does not remember anything about the physical act that resulted in his injury. (*Id.* at PageID.83, 85.) Burnett briefly lost consciousness and recalls waking up with a number of

people standing around him. (ECF No. 35-7 at PageID.163.) Burnett reported that his head and neck hurt, and his face was numb. (ECF No. 35-8 at PageID.187.)

Griffith has submitted video footage which clearly depicts the incident. (ECF No. 32-2.)

## II.   Motion Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Material facts are facts that are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

## III.   Discussion

### A.   Section 1983 Claim

In Count I of his complaint, Burnett alleges a claim captioned Excessive Force and Cruel and Unusual Punishment. (ECF No. 1 at PageID.3–4.) Burnette cited the Fourth, Eighth, and Fourteenth Amendments in support of his claim. Determining which amendment applies is critical to the proper analysis of Burnett's claim because different standards apply depending on the applicable amendment. As the Sixth Circuit explained in *Coley v. Lucas County*, 799 F.3d 530 (6th Cir. 2015):

> When a free citizen claims that a government actor used excessive force during the process of an arrest, seizure, or investigatory stop, we perform a Fourth Amendment inquiry into what was objectively "reasonable" under the circumstances. *Graham*

4

*v. Connor*, 490 U.S. 386, 396 (1989); *Lanman v. Hinson*, 529 F.3d 673, 680 (6th Cir. 2008). These Fourth Amendment protections extend through police booking until the completion of a probable cause hearing. *Aldini v. Johnson*, 609 F.3d 858, 866–67 (6th Cir. 2010). When convicted prisoners bring claims of excessive force, we turn to the Eighth Amendment, which forbids the "unnecessary and wanton infliction of pain" that constitutes "cruel and unusual punishment," and specifically conduct that is malicious and sadistic. *Hudson v. McMillian*, 503 U.S. 1, 5, 7 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)); *United States v. Budd*, 496 F.3d 517, 531–32 (6th Cir. 2007). To violate the Fourteenth Amendment rights of free citizens not subject to search or seizure, the conduct of law enforcement officials must "shock[ ] the conscience," whether it be "malicious and sadistic" behavior in the context of a "fluid" and "dangerous" situation, or "deliberate indifference" when there is "reasonable opportunity to deliberate" before taking action. *Darrah v. City of Oak Park*, 255 F.3d 301, 306 (6th Cir. 2001) (internal quotation marks omitted); *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846–53 (1998).

*Id.* at 537–38 (additional citations omitted). Here, the parties agree that Burnett's excessive force claim is properly evaluated under the Eighth Amendment because he had been convicted of criminal contempt at the time of the incident. (ECF No. 32 at PageID.67; ECF No.128.) *See Hopper v. Plummer*, 887 F.3d 744, 752–53 (6th Cir. 2018) (holding that because the decedent was sanctioned for civil contempt and rather than criminal contempt, the Fourteenth Amendment applied to his excessive force claim); *Sharp v. Kelsey*, 918 F. Supp. 1115, 1122 (W.D. Mich. 1996) (concluding that the plaintiff was subject to the Eighth Amendment as to her excessive force claim because she had been summarily convicted of criminal contempt which "is a crime like any other in the sense that it is a violation of the law punishable by fine or imprisonment or both").

The Eighth Amendment's prohibition against cruel and unusual punishment applies not only to punishment imposed by the state, but also to deprivations that occur during imprisonment and are not part of the sentence imposed. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Estelle v. Gamble*, 429 U.S. 97, 101-02 (1976). Punishment that is without penological justification or involves the unnecessary and wanton infliction of pain also violates the Eighth Amendment's proscriptions. *See Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). In other words, the Eighth

5

Amendment prohibits "the gratuitous infliction of suffering." *Gregg v. Georgia*, 428 U.S. 153, 183 (1976).

The Supreme Court has held that "whenever guards use force to keep order," the standards set forth in *Whitley v. Albers*, 475 U.S. 312 (1986), should be applied. *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). Under *Whitley*, the core judicial inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6–7. In determining whether the use of force is wanton and unnecessary, a court should evaluate the need for application of force, the relationship between that need and the amount of force used, the threat "reasonably perceived by the responsible officials," and any effort made to temper the severity of the forceful response. *Id.* (citing *Whitley*, 475 U.S. at 321). In *Wilkins v. Gaddy*, 559 U.S. 34 (2010), the Supreme Court affirmed that the "core judicial inquiry" is "not whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* at 37 (quoting *Hudson*, 503 U.S. at 7). The Court noted that the degree of injury is still relevant to the inquiry, as it may shed some light on the amount of force used, but "[a]n inmate who complains of a "push or shove" that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Id.* at 38 (quoting *Hudson*, 503 U.S. at 9).

An Eighth Amendment has both an objective and a subjective component. *Cordell v. McKinney*, 759 F.3d 573, 580 (6th Cir. 2014) (citing *Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013)). The objective component requires the "pain inflicted to be 'sufficiently serious'" to offend "contemporary standards of decency." *Id.* at 580 (quoting *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011); *Hudson*, 503 U.S. at 8). The subjective component asks "whether force was

applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* (quoting *Hudson*, 503 U.S. at 7).

There is no question that Burnett has satisfied the objective component of his claim. Griffith forcefully took Burnett to the ground, and Burnett hit his head directly on the hard floor without the use of his hands to brace himself. He received a one-to-two-inch laceration that required treatment at a hospital, including stitches. He also complained of head and neck pain and numbness in his face.

Griffith argues that there is no genuine issue of material fact with regard to the subjective component. First, he notes that he had reason to believe that force was necessary because Burnett's words and acts presented a safety concern. Burnett had been agitated by Judge McKay's contempt ruling and 93-day sentence and, shortly thereafter, had made a generalized threat against corrections officers. In addition, instead of remaining on the bench, Burnett had actively freed himself by loosening the bolt securing his handcuffs to the bench and had succeeded in moving them to the front of his body. This was of particular concern because Burnett could have accessed inmate property located nearby and obtained something he should not have had. Second, a mental health worker had determined that Burnett was a suicide risk, requiring that he be placed in a suicide gown, which further agitated Burnett. Third, Griffith notes, Burnett pulled away and went toward the area where inmate property was kept. Griffith asserts that both his testimony and the video show that his sole intent was to regain control over Burnett. Finally, Griffith argues that the evidence shows that, at all times, he acted professionally without displaying any anger or animosity toward Burnett that would indicate malice or a sadistic intent to inflict pain on Burnett. (ECF No. 32 at PageID.70–71.)

Griffith contends that *Griffin v. Hardrick*, 604 F.3d 949 (6th Cir. 2010), is factually similar to the instant case. The plaintiff in *Griffin* had been arrested for disorderly conduct and resisting arrest and was placed in a holding cell at the jail. With permission, the plaintiff went to the nurse's station to speak with a nurse about bruises on her arms and back. When the nurse declined the plaintiff's repeated demands that she be taken to the hospital, the plaintiff became belligerent and raised her voice. Noticing this activity, the defendant, Hardrick, attempted to speak to the plaintiff about the situation, but she walked away. Hardrick grabbed the plaintiff's arm, and she tried to jerk it away. At that point Hardrick asked another corrections officer, Rutledge, for assistance. The plaintiff struggled with the officers as they escorted her down the hallway. Hardrick thus used a leg-sweep tactic to take the plaintiff to the ground. The tactic worked, but unfortunately, Rutledge accidentally fell on the plaintiff and broke the plaintiff's leg. *Id.* at 951–52. The court noted that the video evidence showed that the plaintiff had been noncompliant and walked away from Hardrick while he attempted to speak with her. The court further noted that the video showed Hardrick attempting to speak with the plaintiff in a calm and nonaggressive manner. *Id.* at 954–55. It thus held that the plaintiff failed to satisfy the subjective prong of her claim:

> The fact that Griffin had been engaged in a loud, lengthy, and animated conversation with the nurse gave Hardrick a reasonable basis to believe that force would be necessary to control Griffin. Similarly, Griffin was struggling against Hardrick and Rutledge as they attempted to lead her away from the nurse's station, giving Hardrick a plausible reason to believe that force was necessary to bring Griffin to the floor so that she could be handcuffed and taken back to her holding cell. Hardrick's initial calm demeanor with Griffin suggests that he was not seeking to wantonly inflict pain on her, but was attempting to bring her under control.

*Id.* at 955.

Burnett counters that the video and other evidence create a genuine issue of material fact that Griffith maliciously intended to inflict pain on Burnett. Burnett does not dispute that the video clearly depicts that he attempted to pull away from Griffith, and he concedes that Griffith had a

plausible need to use some force. Burnett notes, however, that he was handcuffed, and Griffith had no justification for "flinging" him from right to left and slamming him headfirst onto the floor. (ECF No. 35 at PageID.34–35.) Burnett further notes that Griffith weighed 260 lbs., while Burnett was slightly built and defenseless from the force that Griffith used because his hands were handcuffed behind his back. Burnett also argues that Griffith did not attempt to moderate the force he used, even though there were other options, such as giving Burnett verbal commands or seeking assistance from Officer Tessar, who was nearby. (*Id.* at PageID.35.)

Burnett argues that this case is controlled by *Cordell v. McKinney*, 759 F.3d 573 (6th Cir. 2014). In *Cordell*, following a verbal altercation between the plaintiff and the defendant, McKinney, McKinney ordered the plaintiff out of his cell and handcuffed him for a move to a holding cell on the third floor. McKinney was accompanied by other officers as he escorted the plaintiff, walking behind him and raising his handcuffed hands up toward his shoulders in a submissive-style hold. According to the plaintiff, as they proceeded down the hallway, McKinney kept pushing him faster, so the plaintiff tried to turn around to see why McKinney was pushing him so fast. *Id.* at 577. In response, McKinney rammed the plaintiff headfirst into a wall, causing a laceration on the plaintiff's forehead, as well as severe neck and back pain. Once the group reached the holding cell, the plaintiff and McKinney got into a heated discussion. A sergeant eventually removed McKinney from the scene after McKinney failed to comply with his orders to stop arguing with the plaintiff. *Id.* at 578. A security camera video had recorded most of what occurred in the hallway but did not show the moment that McKinney ran the plaintiff into the wall. *Id.* Because it concluded that the objective component was satisfied, the court focused its inquiry on the subjective component of the claim. The court said that because it was undisputed that the plaintiff turned to face McKinney, McKinney had a reasonable basis for using force against the

plaintiff. But the court noted that unresolved was the relationship between need for force and the amount of force used. This was due to the parties' differing versions regarding the amount of force that McKinney used. *Id.* Nonetheless, the court found that, based on the plaintiff's version of events, "a reasonable jury could find that Deputy McKinney lacked a good-faith reason to use Cordell as a human battering ram." *Id.* at 582. First, the court observed that the plaintiff's injuries indicated that McKinney used a considerable amount of force. Second, the court found that a reasonable jury could conclude that the amount of force used was out of proportion to what was needed because the plaintiff's hands were handcuffed behind his back and McKinney had the plaintiff in a submission hold. In addition, the only other people in the hallway were two corrections officers. *Id.* at 583. Finally, the court noted that McKinney made no effort to moderate the force used. The evidence showed that McKinney was forcibly escorting the plaintiff in an aggressive manner. The court also noted that, once the group had reached the holding cell, McKinney's supervisor twice asked him to calm down and eventually removed him from the scene due to his agitated state. *Id.* at 583–84. The court said that in light of these factors, "a reasonable jury could find that Deputy McKinney's use of force was not a good-faith effort to restore control of Cordell, but rather a malicious and sadistic attempt to inflict injury." *Id.* at 584.

The instant case falls somewhere between *Griffin* and *Cordell*, as it has factual elements in common with both cases but also differs from both cases. As in both cases, there was an undisputed need for some force because Burnett was struggling to get away from Griffith. Similar to *Cordell*, Burnett was handcuffed and another corrections officer—Officer Tessar—was close enough to assist with regaining control of Burnett. There is no indication that Griffith attempted to moderate the force he used by, for example, briefly restraining Burnett until Officer Tessar could lend a hand. The video, which clearly depicts the entire incident, shows that Officer Tessar reacted

10

immediately and was in a position to help restrain Burnett. Burnett's injuries are also consistent with the use of a considerable amount of force. In contrast to *Cordell*, however, the video shows that Griffith had Burnett by the arm and not in a submission hold when Burnett tried to escape. No more than four seconds elapsed between the time when Burnett first pulled away and when Griffith took Burnett to the ground, during which time Burnett continued to struggle with Griffith as Griffith tried to regain control. In addition, unlike *Cordell*, corrections officers were not the only persons in the room, and Burnett had made generalized threats against corrections officers.[3]

As for *Griffin*, the most important similarity with the instant case is there is no evidence that Griffith maliciously and sadistically intended to inflict pain on Burnett. Taking Burnett to the ground was a reasonable maneuver in order to regain control of Burnett, although a reasonable jury could conclude that Burnett used more force than was necessary. If Burnett were asserting a Fourth Amendment claim, the evidence might well suffice to create an issue of fact, but Burnett's Eighth Amendment claim has a subjective component, which Burnett has failed to establish. That is, nothing in the video or elsewhere in the record suggests that Griffith sought wantonly to inflict pain on Burnett.

Burnett's arguments to the contrary are not persuasive. First, Burnett says that Griffith's untruthfulness in his Use of Force Report (ECF No. 35-4), when he wrote that he "placed" Burnett on the ground, indicates malicious intent. Burnett suggests that maliciousness can be inferred because Griffith did not write in his report that he "slammed" Burnett to the ground. I disagree. Griffith's account was not inaccurate and, because it was written after the incident, is not evidence of his frame of mind at the time of the incident. Moreover, Griffith was fully aware that security

---

[3] Burnett offers no evidence to refute Griffith's testimony that Burnett had made a generalized threat to assault corrections officers.

cameras recorded activity in the booking room. Burnett also argues that Griffith's malicious intent can be inferred from Burnett's own pre-incident acts and statements because they would have angered Griffith. But this argument is founded on nothing more than speculation. The video, which is the only evidence on the issue, shows that Griffith acted calmly and professionally both before and after the incident. Nothing in the record suggest that, in contrast to Deputy McKinney's demeanor in *Cordell*, Griffith was agitated with Burnett.

Accordingly, because Burnett fails to establish the subjective component of his claim, I recommend that Griffith is entitled to summary judgment.[4]

### B.     Assault and Battery Claim

Griffith also argues that he is entitled to summary judgment on Burnett's assault and battery claim based on governmental immunity.[5] A governmental employee may establish a right to immunity on an intentional tort by showing: (1) that his acts were undertaken during the course of employment and he was acting, or reasonably believed he was acting, within the scope of his employment; (2) he performed the challenged acts in good faith or without malice; and (3) the acts were discretionary, as opposed to ministerial. *Odom v. Wayne Cty.*, 482 Mich. 459, 480 (2008).

---

[4] Griffith also argues that he is entitled to qualified immunity. Because the undisputed evidence shows that Burnett cannot make out a constitutional violation, a separate qualified immunity analysis is unnecessary. *See Williams v. City of Taylor*, No. 95-2221, 1997 WL 720394, at *4 (6th Cir. Nov. 10, 1997) ("Because we agree with the district court that the record contains no evidence that the Williamses were treated differently from other Taylor residents on account of their race . . . we find it unnecessary to address the question of qualified immunity.").

[5] If the Court adopts the recommendation to grant summary judgment on Burnett's Section 1983 claim, it must consider whether to exercise supplemental jurisdiction over the assault and battery claim pursuant to 28 U.S.C. § 1367(c). Although the Sixth Circuit has held that, "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims," *Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1254–55 (6th Cir. 1996), I recommend that the Court exercise its discretion to address Burnett's state-law assault and battery claim because it is closely related to his Section 1983 claim and judicial economy favors this Court addressing the claim on the merits.

Only the second element is at issue here. "Good faith" is a subjective test, under which a defendant is subject to liability only if he acted with "malicious intent." *Id.* at 482; *see also Brown v. Lewis*, 779 F.3d 401, 420 (6th Cir. 2015) (noting that *Odom* overruled prior case law that held that an objective test applied to intentional tort claims, such as assault and battery, for purposes of governmental immunity).

Burnett fails to present evidence showing that Griffith applied force with malice. As set forth above, Griffith applied force in order to gain control of Burnett. There is no indication that Griffith did not carry out his duties in good faith. Even if it can be said that the force Griffith used went beyond that which may have been reasonably necessary, there no evidence in the record creating a genuine issue of material fact that Griffith acted with malice toward Burnett.

Accordingly, I recommend that Griffith's motion be granted as to the assault and battery claim.

## IV. Conclusion

For the reasons set forth above, I recommend that the Court **grant** Defendant's Motion for Summary Judgment (ECF No. 31) and dismiss the complaint with prejudice.

Dated: December 8, 2020        /s/ Sally J. Berens
                                                   SALLY J. BERENS
                                                   U.S. Magistrate Judge

### **NOTICE TO PARTIES**

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).